1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

11 T.F. WARREN GROUP, INC.,
VANGUARD SHIPPING (GREAT
LAKES) LTD., VANSHIP LTD.,
REMSTOAN INVESTMENTS, INC.,
8219222 CANADA, INC., o/a PHOENIX
STAR SHIPPING, and PHOENIX SUN
SHIPPING INC.,

NO.

COMPLAINT

(Clerk's Action Required)

Plaintiff(s),

v.

MARCON INTERNATIONAL, INC.,
BRIAN K. PETERSON and JANE DOE
PETERSON, husband and wife, and the
marital community composed thereof,

Defendant(s).

## **COMPLAINT**

Plaintiffs, T.F. Warren Group, Inc. ("Warren"), Vanguard Shipping (Great Lakes)

Ltd. ("Vanguard"), Vanship Ltd. ("Vanship"), Remstoan Investments Inc. ("Remstoan"),

8219222 Canada Inc. operating as Phoenix Star Shipping ("Phoenix Star"), and Phoenix

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

Sun Shipping Inc. ("Phoenix Sun")(collectively, "Plaintiffs"), by and through their New York counsel, Kavinoky Cook LLP, and local counsel Rodney Q. Fonda of Preg, O'Donnell & Gillett, for their Complaint against Defendants, Marcon International, Inc. ("Marcon"), Brian K. Peterson, and Jane Doe Peterson ("Peterson")(collectively, "Defendants"), state and allege as follows:

## PARTIES

1.      Plaintiff Warren was at all times mentioned a corporation organized and existing under the laws of Ontario, Canada, having at all material times a principal place of business at Brantford, Ontario, Canada.

2.      Plaintiff Vanguard was at all times mentioned a corporation organized and existing under the laws of Canada, having at all material times a principal place of business at St. Catharines, Ontario, Canada.  Plaintiff Vanguard is an affiliate of Plaintiff Warren.

3.      Plaintiff Vanship was at all times mentioned a corporation organized and existing under the laws of Canada, having at all material times a principal place of business at St. Catharines, Ontario, Canada.  Plaintiff Vanship is an affiliate of Plaintiff Warren.

4.      Plaintiff Remstoan was at all times mentioned a corporation organized and existing under the laws of the Province of Ontario, Canada, having a principal place of business at Brantford, Ontario, Canada.  Plaintiff Remstoan is an affiliate of Plaintiff Warren.

COMPLAINT - 2
10644-0002  5297549.doc
Cause No.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

5.      Plaintiff Phoenix Star was at all times mentioned a corporation organized and existing under the laws of Canada, having a principal place of business at Brantford, Ontario, Canada.   Plaintiff Phoenix Star is an affiliate of Plaintiff Warren.

6.      Plaintiff Phoenix Sun was at all times mentioned a corporation organized and existing under the laws of Canada, having a principal place of business at Brantford, Ontario, Canada.  Plaintiff Phoenix Sun is an affiliate of Plaintiff Warren.

7.      Upon information and belief, Defendant Marcon, is and was at all times mentioned a corporation organized and existing under the laws of the State of Washington, having a principal place of business in Coupeville, Washington.

8.      Upon information and belief, Defendant Brian Peterson, and his spouse, if any, are and were at all times mentioned residing within the State of Washington. If married, the Peterson defendants comprised a marital community pursuant to the laws of the State of Washington. All acts and omissions of defendant Brian Peterson were done on behalf of and for the benefit of the marital community.

9.      Upon information and belief, Defendant Brian Peterson, is and was at all times mentioned a broker employed, affiliated and/or associated with Defendant Marcon.

COMPLAINT - 3
10644-0002  5297549.doc
 Cause No.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2), as there is diversity of citizenship between Plaintiffs, citizens of a foreign state, and Defendants, citizens of a different state, and the amount in controversy exceeds the sum of $75,000.00.

11.     This Court has personal jurisdiction over Defendants as Defendants are residents of the State of Washington, within the confines of the Western District of Washington, and are and have been engaged in a continuous and systematic course of business in the State of Washington, within the confines of the Western District of Washington.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and § 1391(b)(2) as Defendants reside in the Western District of Washington, and because the events, acts and omissions giving rise to the claims occurred in the Western District of Washington.

**I.     FACTS**
**PLAINTIFF VANGUARD'S ACQUISITION OF THE J.W. SHELLEY**
**(F/K/A VALGOCEN ALMIRANTE)**

13.     In 2008, Plaintiff Vanguard was formed for the purpose of owning and operating a vessel to engage in a Great Lakes shipping venture with one of the oldest and largest grain brokerages in the world.

14.     To engage in such shipping venture, Plaintiff Vanguard contemplated the purchase of a bulk carrier vessel named the S/S VALGOCEN ALMIRANTE.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

15.     At the time, the vessel had been in lay-up status since a prior sale, and Plaintiff Vanguard was advised that it would need to undertake certain actions to utilize the vessel in the Great Lakes shipping venture, including, but not limited to, re-classification and re-registration.

16.     As part of the due diligence process, representatives of Plaintiff Vanguard engaged Defendant Marcon, an international broker of marine vessels and barges, to prepare "a written report providing an opinion of the Fair Market Value (FMV), and Orderly Liquidation Value (OLV) for the subject vessel … on an "as is, where is" basis, as well as on the basis of her being completely rebuilt and re-classed with Lloyd's Registry and registered under the Canadian Registry for continue/dedicated employment in the grain market of the Canadian Great Lakes and St. Lawrence Seaway system."

17.     Defendant Peterson, a vessel broker, was assigned to perform the requested valuation on behalf of Defendant Marcon.

18.     According to information provided by Defendant Peterson to Plaintiff Vanguard, Defendant Peterson had over twenty (20) years of employment as a USCG Licensed Mariner, Shipping Agent, and a vessel broker.

19.     Based on this information provided to Plaintiff Vanguard by Defendant Peterson, Plaintiff Vanguard reasonably believed Defendant Peterson to be highly qualified and knowledgeable about the commercial marine industry, specifically regarding the vessel and market values.

20.     On or about May 9, 2008, Defendants delivered a written report entitled "Market Valuation Appraisal" for the VALGOCEN ALMIRANTE to representatives of Plaintiff Vanguard (the "May 2008 Appraisal").

21.     The May 2008 Appraisal stated that Defendant Marcon was familiar with the vessel having reviewed a recent survey prepared by Bud Fraser of The Salvage Association and certain documents related to the acquisition of the vessel, as well as by having conducted two on-site physical inspections of the vessel, once in February 2008 and again on May 6, 2008.

22.     The May 2008 Appraisal further stated that Defendant Marcon was familiar with the vessel by publicly available information in the market, and by Defendant Marcon's general activity in the sale and purchase market of second hand commercial marine tonnage.

23.     Based on review of the material provided and information gathered from various sources in the industry, Defendant Peterson prepared two valuations of the VALGOCEN ALMIRANTE.

24.     Defendant Peterson's first valuation of the vessel was based on an "as is, where is" sale of the asset without any further work on the vessel: FMV USD $4,400,000.00 and OLV USD $2,700,000.00.

25.     Defendant Peterson's second valuation of the vessel took into account the estimated costs to refurbish, re-classify and re-register the vessel so that it was fully operational in the Great Lakes and Seaway market: FMV USD $14,800,000.00 and OLV USD $12,580,000.00.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON 98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

26.     In reliance on the May 2008 Appraisal prepared by Defendants and Defendants' valuation of the vessel, Plaintiff Vanguard proceeded with the purchase of the VALGOCEN ALMIRANTE.

27.     Upon Plaintiff Vanguard's acquisition of the vessel VALGOCEN ALMIRANTE, it was re-named the J.W. SHELLEY.

28.     After the purchase of the vessel, Plaintiff Vanguard undertook and completed the required work to refurbish the vessel, re-classify and re-register the vessel.

29.     In February 2009, as a result of the significant refurbishment of the vessel and changing market conditions in the commercial marine industry, Plaintiff Vanguard engaged Defendant Marcon to prepare an updated "written report providing an opinion of the Fair Market Value (FMV), and Orderly Liquidation Value (OLV) for the subject vessel J.W. SHELLEY for today's date on an "as is, where is" basis."

30.     As of February, 2009, the vessel was registered under the Canadian Registry and in dedicated employment in the grain market of the Canadian Great Lakes and St. Lawrence Seaway system.

31.     Once again, Defendant Peterson, a vessel broker, was assigned to perform the requested valuation on behalf of Defendant Marcon.

32.     On or about February 9, 2009, Defendants delivered a written report entitled "Market Valuation Appraisal" for the J.W. SHELLEY to representatives of Plaintiff Vanguard (the "February 2009 Appraisal").

COMPLAINT - 7
10644-0002 5297549.doc
Cause No.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON 98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

33.     The February 2009 Appraisal stated that Defendant Marcon was familiar with the vessel having previously reviewed the vessel in May 2008 and having given an opinion as to valuation at the time.

34.     The February 2009 Appraisal further stated that Defendant Marcon was asked to review the vessel on a "desk top appraisal basis, at this time, taking into account her current position (currently trading with present certification in place, etc.), but also taking into account the current market trading conditions in place today, versus the market conditions which were in place when we conducted the appraisal of the vessel in May 2008."

35.     The February 2009 Appraisal discussed in detail the general collapse of the bulk vessel market during the fourth quarter of 2008, and the effect that this overall collapse had on the market value of bulk ships world-wide.

36.     Based on review of the material provided and information gathered from various sources in the industry, Defendant Peterson prepared a valuation of the J.W. SHELLEY.

37.     Defendant Peterson's valuation of the vessel J.W. SHELLEY as of February, 2009 was: FMV USD $9,500,000.00 and OLV USD $8,075,000.00.

### PLAINTIFF REMSTOAN'S INVESTMENT IN PLAINTIFF VANGUARD

38.     In  early 2009, Plaintiff Vanguard approached representatives of Plaintiff Remstoan about the possibility of investing in the Great Lakes shipping venture.

39.     As part of the due diligence process, representatives of Plaintiff Remstoan reviewed information provided by Plaintiff Vanguard regarding the shipping venture and

COMPLAINT - 8
10644-0002  5297549.doc
 Cause No.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

the J.W. SHELLEY, including, but not limited to, the market appraisal reports prepared by Defendant Marcon.

40.    In reliance on Defendants' valuation of the vessel as of February, 2009, Plaintiff Remstoan proceeded to invest in Plaintiff Vanguard, acquiring a twenty-five percent (25%) interest in the company.

41.    In late 2010, representatives of Plaintiff Remstoan were approached by one of the other owners of Plaintiff Vanguard about the possibility of purchasing an additional ownership interest in the company.

42.    Plaintiff Remstoan proceeded to engage in negotiations with the other owner for the purchase of their twenty-five percent (25%) interest in Plaintiff Vanguard.

43.    In continuing reliance on Defendants' valuation of the vessel J.W. SHELLEY, Plaintiff Remstoan decided to proceed with the purchase of an additional ownership interest in Plaintiff Vanguard.

44.    By the end of 2010, Plaintiff Remstoan was a fifty percent (50%) owner of Plaintiff Vanguard.

## FORMATION OF PLAINTIFF VANSHIP TO ENGAGE IN SECOND SHIPPING VENTURE

45.    In early 2011, Plaintiff Vanguard was approached by another major worldwide grain brokerage concerning the possibility of purchasing a second vessel to be dedicated to the transportation of grain on an exclusive basis.

46.    Following a number of months of negotiations, a deal was made with the grain brokerage, and representatives of Plaintiff Vanguard began searching for a second vessel to purchase.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

47.     In 2011, Plaintiff Vanship was formed by the owners of Plaintiff Vanguard for the purpose of owning and operating the second vessel.

48.     Plaintiff Remstoan owned a fifty percent (50%) interest in Plaintiff Vanship.

### PLAINTIFF VANSHIP'S ACQUISITION OF THE VSL CENTURION (F/K/M.V. BESTSTAR)

49.     Plaintiff Vanguard/Plaintiff Vanship located a target vessel of the type required for Great Lakes grain shipping in China.

50.     The parties engaged in negotiations for the purchase of the vessel, known as M.V. BESTSTAR and a closing date was scheduled for July 31, 2011.

51.     As part of the due diligence process, representatives of Plaintiff Vanguard/Plaintiff Vanship engaged a marine surveying firm, Standard Marine Surveyors and Adjusters (Tianjin) Co. Ltd. ("Standard Marine"), to attend upon the vessel in China with Plaintiff's personnel to prepare a report on the condition of the vessel.

52.     As part of the due diligence process, representatives of Plaintiff Vanguard/Plaintiff Vanship also engaged Defendant Marcon to prepare "a written report providing an opinion of the Fair Market Value (FMV) for the subject vessel … on an "as is, where is" basis."

53.     Once again, Defendant Peterson, a vessel broker, was assigned to perform the requested valuation on behalf of Defendant Marcon.

COMPLAINT - 10
10644-0002 5297549.doc
Cause No.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

54.     Plaintiff Vanguard/Plaintiff Vanship provided Defendants with the information obtained from Standard Marine to consider when preparing the appraisal of the vessel.

55.     On or about March 15, 2011, Defendants delivered a written report entitled "Market Valuation Appraisal" for the BESTSTAR to representatives of Plaintiff Vanguard/Plaintiff Vanship (the "March 2011 Appraisal").

56.     The March 2011 Appraisal stated that Defendant Marcon was familiar with the vessel having reviewed the survey material provided by Plaintiff Vanguard/Plaintiff Vanship, including, a recent marine condition survey report undertaken by Standard Marine on March 6, 2011.

57.     The March 2011 Appraisal further stated that Defendant Marcon was familiar with the vessel by publicly available information in the market, and by Defendant Marcon's general activity in the sale and purchase market of second hand commercial marine tonnage.

58.     Based on review of the material provided and information gathered from various sources in the industry, Defendant Peterson prepared a valuation of the BESTSTAR.

59.     Defendant Peterson's valuation of the vessel BESTSTAR was: FMV USD $6,000,000.00.

60.     In reliance on the March 2011 Appraisal prepared by Defendants and Defendants' valuation of the vessel, Plaintiff Vanship proceeded with the purchase of the BESTSTAR.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

61.     Upon Plaintiff Vanship's acquisition of the vessel, it was re-named the VSL CENTURION.

## BANKRUPTCY OF PLAINTIFF VANGUARD AND PLAINTIFF VANSHIP UNDER THE COMPANIES CREDITORS ARRANGEMENT ACT OF CANADA

62.     Plaintiff Remstoan's investment in the shipping ventures was intended to be a passive investment and by the fall of 2011 it was consuming too much management time and effort, so Plaintiff Remstoan determined to sell its interest in both Vanguard and Vanship.

63.     From October 2011 to March 2012, Plaintiff Remstoan engaged in discussions with the other owner of Plaintiff Vanguard and Plaintiff Vanship about the possibility of such owner purchasing Plaintiff Remstoan's fifty percent (50%) interest in each company.

64.     On or about March 22, 2012, Plaintiff Vanguard and Plaintiff Vanship filed for bankruptcy under the Companies Creditors Arrangement Act of Canada ("CCAA"). During the course of the CCAA process, Plaintiff Warren arranged for debtor in possession financing for both companies.

65.     Plaintiff Warren believed that if some of the financial burden was relieved, both vessels J.W. SHELLEY and VSL CENTURION could be operated profitably under the existing grain brokerage contracts, especially because Plaintiff Warren spent in excess of $1,000,000.00 in repairs and upgrades to both vessels prior to the CCAA process.

66.     Based on the Defendants' valuation of each vessel, Plaintiff Warren reasonably believed that there remained sufficient equity in the vessels to support Plaintiffs' continued investment.

67.     Plaintiff Warren formed two separate entities for the purpose of owning and operating the vessels, Plaintiff Phoenix Star and Plaintiff Phoenix Sun.

68.     In reliance on the appraisal reports prepared by Defendants, Plaintiffs Phoenix Sun and Phoenix Star made offers to purchase the two vessels out of the CCAA process, and were ultimately successful.

### PLAINTIFF PHOENIX STAR'S ACQUISITION OF THE
### PHOENIX STAR (F/K/A J.W. SHELLEY)

69.     In August 2012, Plaintiff Phoenix Star acquired the J.W. SHELLEY for the price of $11,400,000.00.

70.     Upon Plaintiff Phoenix Star's acquisition of the vessel, it was re-named again as the PHOENIX STAR.

71.     Due to the length of time of the sale process, the PHOENIX STAR did not begin operations until mid-August 2012, thereby missing half of the shipping season, but was in operation until the close of the St. Lawrence Seaway for the season.

72.     During this time, the PHOENIX STAR operated in accordance with Plaintiff Phoenix Star's business plan, and was profitable.

### PLAINTIFF PHOENIX SUN'S ACQUISITION OF THE
### PHOENIX SUN (F/K/A VSL CENTURION)

73.     In August 2012, Plaintiff Phoenix Sun acquired the VSL CENTURION for the price of $8,500,000.00.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

74.     Upon Plaintiff Phoenix Sun's acquisition of the vessel, it was renamed the PHOENIX SUN.

75.     Due to the length of time of the sale process and certain mechanical issues, the PHOENIX SUN did not begin operations until October 2012, and the operation of the vessel was unreliable.

76.     During this time, the PHOENIX SUN did not operate in accordance with Plaintiff Phoenix Sun's business plan, and was not profitable for 2012.

### PLAINTIFF PHOENIX STAR'S DISCOVERY OF DEFENDANTS' SIGNIFICANT OVERVALUATION OF THE VESSEL PHOENIX STAR

77.     During 2012, Plaintiff Phoenix Star invested a total of $1,845,646.00 to complete steel and mechanical work to the vessel PHOENIX STAR.

78.     On or about October 16, 2012, during one of its runs from Quebec City into the Upper Lakes, the PHOENIX STAR struck bottom in the St. Lawrence River. While the hull was not breached in the incident, there was substantial damage done to the vessel.

79.     Plaintiff Phoenix Star arranged for underwater surveys of the vessel, and it was estimated that the damages to the vessel ranged from $650,000.00 to $800,000.00.

80.     After repairs were completed, the Phoenix Sun was released to sail.

81.     Thereafter, the vessel experienced leaks and the decision was made by Plaintiff Phoenix Star to put the vessel in drydock.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

82.     On or about December 21, 2012, the PHOENIX STAR arrived at the Toledo shipyard of Ironhead Marine, and on December 23, 2012, the vessel was put in drydock due to leaking issues.

83.     While in drydock in early 2013, a new survey of the ship was undertaken and the estimate to repair the damages related to the accident and further work unrelated to the accident  to bring the vessel to full compliance with Lloyd's Registry standards exceeded $10,000,000.00, approximately half of which would have had to have been spent during the 2013 winter layup.

84.     This information was shocking to Plaintiff Phoenix Star, given the Defendants' valuation of the vessel contained in the May 2008 Appraisal and the February 2009 Appraisal.

85.     It was at this time that Plaintiff Phoenix Star discovered that Defendants had significantly overvalued the vessel PHOENIX STAR.

### PLAINTIFF PHOENIX SUN'S DISCOVERY OF DEFENDANTS' SIGNIFICANT OVERVALUATION OF THE PHOENIX SUN

86.     During 2012, Plaintiff Phoenix Sun invested a total of $2,499,813.00 to complete mechanical and electrical improvements to the PHOENIX SUN.

87.     After discovery of the significant damage to the PHOENIX STAR, Plaintiff Phoenix Sun decided to undertake a complete survey of the PHOENIX SUN.

88.     Although it was not necessary to put the PHOENIX SUN in drydock, a survey of the vessel was undertaken in 2013 and it was estimated that an expenditure of an amount similar to that required for PHOENIX STAR would be necessary to bring the vessel up to applicable standards.

COMPLAINT - 15
10644-0002 5297549.doc
Cause No.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON 98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

89.     This information was shocking to Plaintiff Phoenix Sun, given the Defendants' valuation of the vessel contained in the March 2011 Appraisal.

90.     It was at this time that Plaintiff Phoenix Sun discovered that Defendants had significantly overvalued the vessel PHOENIX SUN.

### PLAINTIFF PHOENIX STAR'S AND PLAINTIFF PHOENIX SUN'S SALE OF THE VESSELS AT A SIGNIFICANT LOSS

91.     Looking at a combined capital expenditure of approximately $20.0 million to keep both vessels in compliance with applicable standards, the decision was made by Plaintiffs Phoenix Star and Phoenix Sun to exit the shipping industry.

92.     Despite their best efforts in early 2013, Plaintiffs Phoenix Star and Phoenix Sun were unable to locate purchasers for the vessels.

93.     In March 2013, both Plaintiffs Phoenix Star and Phoenix Sun were placed in receivership, and the court-appointed receiver initiated the process to sell the vessels.

94.     In May 2013, the sale of the vessels was approved.

95.     Despite the fair market values determined by Defendants in the appraisal reports (FMV $14,800,000.00 in the May 2008 Appraisal and FMV $9,500,000.00 in the February 2009 Appraisal), the PHOENIX STAR sold significantly below the Defendants' valuations.

96.      The PHOENIX STAR was sold to Ironhead Marine, Inc. for the purchase price of $790,865.00.

COMPLAINT - 16
10644-0002  5297549.doc
Cause No.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

97.     Despite the fair market value determined by Defendants in the appraisal report (FMV $6,000,000.00 in the March 2011 Appraisal), the PHOENIX SUN sold significantly below the Defendants' valuation.

98.     The PHOENIX SUN was sold to Goldrich Waters International Shipping Co. Ltd. for the purchase price of $1,050,000.00.

99.     As a result of the Defendants' significant overvaluation of the subject vessels, Plaintiffs sustained significant losses on the sale of the vessels.

## COUNT I

## BREACH OF CONTRACT

### (MAY 2008 APPRAISAL AND FEBRUARY 2009 APPRAISAL OF THE PHOENIX STAR)

100.     Plaintiffs repeat and reallege as though fully set forth herein each of the allegations set forth in paragraphs 1 through 100.

101.     In 2008, Plaintiff Vanguard was formed for the purpose of owning and operating a vessel for a new grain brokerage deal.

102.     In early 2008, prior to the purchase of the vessel now known as the PHOENIX STAR, Plaintiff Vanguard engaged Defendants to prepare a written report on the valuation of the vessel.

103.     In accordance with the parties agreement, Defendants prepared and delivered a written report, the May 2008 Appraisal, to Plaintiff Vanguard, which contained two valuations of the PHOENIX STAR.

104.     Based on the detailed information contained in the appraisal report and Defendant Peterson's representations to Plaintiff Vanguard that he was highly qualified

COMPLAINT - 17
10644-0002  5297549.doc
Cause No.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

and knowledgeable about the commercial marine industry, specifically regarding the vessel and market values, Plaintiff Vanguard reasonably believed Defendants' representations as to the valuation of the vessel to be true, and in justifiable reliance thereon Plaintiff Vanguard purchased the PHOENIX STAR for the agreed upon purchase price.

105.   After the purchase of the vessel, Plaintiff Vanguard undertook renovations to re-classify and re-register the vessel.

106.   As a result of the significant renovations and changing market conditions, Plaintiff Vanguard engaged Defendants to prepare a written report on the valuation of the vessel as of February 2009.

107.   In accordance with the parties agreement, Defendants prepared and delivered a written report, the February 2009 Appraisal, to Plaintiff Vanguard, which contained a valuation of the PHOENIX STAR.

108.   Based on the detailed information contained in the appraisal report and Defendant Peterson's representations to Plaintiff Vanguard that he was highly qualified and knowledgeable about the commercial marine industry, specifically regarding the vessel and market values, Plaintiff Vanguard reasonably believed Defendants' representations as to the valuation of the vessel to be true.

109.   In 2009, Plaintiff Remstoan purchased an ownership interest in Plaintiff Vanguard, in reliance on the May 2008 Appraisal and February 2009 Appraisal prepared by Defendants for Vanguard.

PREG O'DONNELL & GILLETT PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON 98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

110.     In late 2010, Plaintiff Remstoan purchased an additional ownership interest in Plaintiff Vanguard, in continuing reliance on Defendants' valuation of the vessel now known as PHOENIX STAR made to Vanguard.

111.     By the end of 2010, Plaintiff Remstoan was a fifty percent (50%) owner of Plaintiff Vanguard.

112.     In March 2012, Plaintiff Vanguard filed for bankruptcy protection.

113.     During the course of the bankruptcy protection process, Plaintiff Warren arranged for debtor in possession financing for the company.

114.     Plaintiff Warren believed that if some of the financial burden was relieved, the shipping vessel could be operated profitably under the existing grain brokerage contract.

115.     Based on the Defendants' valuation of the PHOENIX STAR, Plaintiff Warren reasonably believed that there remained sufficient equity in the vessel to support Plaintiffs' continued investment.

116.     In reliance on the appraisal reports prepared by Defendants, Plaintiff PHOENIX STAR made an offer to purchase the PHOENIX STAR out of bankruptcy.

117.     In August 2012, Plaintiff Phoenix Star acquired the PHOENIX STAR for the price of $11,400,000.00.

118.     Thereafter, in October 2012, the PHOENIX STAR ran aground, and as a result of continuing leaking issues, Plaintiff Phoenix Star arranged to have the vessel put in drydock in December 2012.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

119.   At that time, a complete survey of the ship was undertaken and the estimate to repair leaks and bring the vessel back to the applicable standards exceeded $10,000,000.00.

120.   This information was shocking to Plaintiff Phoenix Star, given the Defendants' valuation of the vessel contained in the March 2008 Appraisal and the February 2009 Appraisal.

121.   It was at that time that Plaintiff Phoenix Star discovered that Defendants' valuation of the vessel PHOENIX STAR was significantly overvalued.

122.   In March 2013, Plaintiff Phoenix Star was placed in receivership, and the vessel sold for the purchase price of $790,865.00.

123.    Despite the values determined by Defendants in the appraisal reports (FMV $14,800,000.00 in the May 2008 Appraisal and FMV $9,500,000.00 in the February 2009 Appraisal), the PHOENIX STAR sold significantly below the Defendants' valuations.

124.   As a result of the Defendants' significant overvaluation of the subject vessel PHOENIX STAR, Plaintiff Phoenix Star sustained a significant loss.

125.   At the time Defendants prepared the May 2008 Appraisal and the February 2009 Appraisal, Defendants knew or should have known that their representations regarding the value of the PHOENIX STAR were not true and correct in all material respects.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

126.    Based on the information provided by Defendants to Plaintiff Vanguard, Plaintiff Vanguard did not have any reason to suspect that Defendants' representations regarding the valuation of the vessel were not true and correct in all material respects.

127.    As a result of Defendants' misrepresentations as to the valuation of the vessel PHOENIX STAR, Plaintiff Warren, Plaintiff Vanguard, Plaintiff Remstoan, and Plaintiff Phoenix Star overestimated the value of the vessel, and agreed to purchase the vessel and/or invest a greater amount than they would have, had they known the true value of the PHOENIX STAR.

128.    Defendants breached the agreements with Plaintiff Vanguard by their misrepresentations regarding the value of the PHOENIX STAR.

129.    At all times relevant hereto, Plaintiff Vanguard complied with all terms and conditions required under the parties' agreements.

130.    As a direct and proximate result of Defendants' breach of the agreements, Plaintiff Warren, Plaintiff Vanguard, Plaintiff Remstoan, and Plaintiff Phoenix Star have been caused to incur significant costs, expenses and damages in excess of $10,000,000.00.

131.    For the reasons described above, Defendants are liable to Plaintiff Vanguard, Plaintiff Remstoan, and Plaintiff Phoenix Star in an amount to be proven at trial but not less than $10,000,000.00.

## COUNT II

## BREACH OF CONTRACT

## (MARCH 2011 APPRAISAL OF THE PHOENIX SUN)

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

132.     Plaintiffs repeat and reallege as though fully set forth herein each of the allegations set forth in paragraphs 1 through 132.

133.     In 2011, Plaintiff Vanguard formed a new entity, Plaintiff Vanship, for the purpose of owning and operating a second vessel for a new grain brokerage deal.

134.     Plaintiff Remstoan owned a fifty percent (50%) interest in Plaintiff Vanship.

135.     In early 2011, prior to the purchase of the vessel now known as the PHOENIX SUN, Plaintiff Vanguard/Plaintiff Vanship engaged Defendants to prepare a written report on the valuation of the vessel.

136.     In accordance with the parties agreement, Defendants prepared and delivered a written report, the March 2011 Appraisal, to Plaintiff Vanguard/Plaintiff Vanship, which contained a valuation of the vessel.

137.     Based on the detailed information contained in the appraisal report and Defendant Peterson's representations to Plaintiff Vanguard/Plaintiff Vanship that he was highly qualified and knowledgeable about the commercial marine industry, specifically regarding the vessel and market values, Plaintiff Vanguard/Plaintiff Vanship reasonably believed Defendants' representations as to the valuation of the vessel to be true, and in justifiable reliance thereon Plaintiff Vanship purchased the PHOENIX SUN for the agreed upon purchase price.

138.     In March 2012, Plaintiff Vanship filed for bankruptcy protection as a result of financial hardships.

139.     During the course of the bankruptcy protection process, Plaintiff Warren arranged for debtor in possession financing for the company.

**PREG O'DONNELL & GILLETT PLLC**
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

140.    Plaintiff Warren believed that if some of the financial burden was relieved, the shipping vessel could be operated profitably under the existing grain brokerage contract.

141.    Based on the Defendants' valuation of the PHOENIX SUN, Plaintiff Warren reasonably believed that there remained sufficient equity in the vessel to support Plaintiff's continued investment.

142.    In reliance on the appraisal report prepared by Defendants, Plaintiff Phoenix Sun made an offer to purchase the PHOENIX SUN in the CCAA proceeding.

143.    In August 2012, Plaintiff Phoenix Sun acquired the PHOENIX SUN for the price of $8,500,000.00.

144.    After Plaintiff Phoenix Star discovered the significant discrepancy between the appraised value of the PHOENIX STAR and its actual value, Plaintiff Phoenix Sun decided to undertake a complete survey of the PHOENIX SUN.

145.    Although it was not necessary to put the PHOENIX SUN in drydock, a survey of the vessel was undertaken and it was estimated that an expenditure of an amount similar to that required for PHOENIX STAR would be necessary to bring the vessel up to applicable standards.

146.    This information was shocking to Plaintiff Phoenix Sun, given the Defendants' valuation of the vessel PHOENIX SUN contained in the March 2011 Appraisal.

147.    It was at this time that Plaintiff Phoenix Sun discovered that Defendants' valuation of the vessel PHOENIX SUN was significantly overvalued.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

148.   In March 2013, Plaintiff Phoenix Sun was placed in receivership by creditors, and the vessel sold for the purchase price of $1,050,000.00.

149.   Despite the fair market value determined by Defendants in the appraisal report (FMV $6,000,000.00 in the March 2011 Appraisal), the PHOENIX SUN sold significantly below the Defendants' valuation.

150.   As a result of the Defendants' gross overvaluation of the subject vessel PHOENIX SUN, Plaintiff Phoenix Sun sustained a significant loss.

151.   At the time Defendants prepared the March 2011 Appraisal, Defendants knew or should have known that their representations regarding the value of the vessel now known as the PHOENIX SUN were not true and correct in all material respects.

152.   Based on the information provided by Defendants to Plaintiff Vanguard/Plaintiff Vanship, Plaintiff Vanguard/Plaintiff Vanship did not have any reason to suspect that Defendants' representations regarding the valuation of the vessel PHOENIX SUN were not true and correct in all material respects.

153.   As a result of Defendants' misrepresentations as to the valuation of the vessel PHOENIX SUN, Plaintiff Warren, Plaintiff Vanguard/Plaintiff Vanship, Plaintiff Remstoan, and Plaintiff Phoenix Sun overestimated the value of the vessel, and agreed to purchase the vessel and/or invest a greater amount than they would have, had they known the true value of the PHOENIX SUN.

154.   Defendants breached the agreements with Plaintiff Vanguard/Plaintiff Vanship by their misrepresentations regarding the value of the PHOENIX SUN.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

155.    At all times relevant hereto, Plaintiff Vanguard/Plaintiff Vanship complied with all terms and conditions required under the parties agreement.

156.    As a direct and proximate result of Defendants' breach of the agreements, Plaintiff Vanguard/Plaintiff Vanship, Plaintiff Remstoan, and Plaintiff Phoenix Sun have been caused to incur significant costs, expenses and damages in excess of $10,000,000.00.

157.    For the reasons described above, Defendants are liable to Plaintiff Vanguard/Plaintiff Vanship, Plaintiff Remstoan, and Plaintiff Phoenix Sun in an amount to be proven at trial but not less than $10,000,000.00.

## COUNT III

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

158.    Plaintiffs repeat and reallege as though fully set forth herein each of the allegations set forth in paragraphs 1 through 158.

159.    Defendants had a duty to act in good faith when dealing with Plaintiffs in the performance of their market valuation appraisals of the vessels pursuant to the terms of the agreements, and Defendants had a duty to disclose the truth regarding their performance of the market valuation appraisals and the representations as to value that they made in the May 2008 Appraisal, February 2009 Appraisal, and March 2011 Appraisal.

160.    As a result of Defendants' failure to perform the market valuation appraisals of the vessels in accordance with generally accepted standards, and their

**PREG O'DONNELL & GILLETT** PLLC

901 FIFTH AVE., SUITE 3400

SEATTLE, WASHINGTON 98164-2026

TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

failure to disclose the true valuation of the vessels, Defendants breached their duty of good faith and fair dealing to Plaintiffs.

161.    As a direct and proximate result of Defendants' breach of their duty of good faith and fair dealing, Plaintiffs have been caused to incur significant costs, expenses and damages in excess of $20,000,000.00.

162.    For the reasons described above, Defendants are liable to Plaintiffs in an amount to be proven at trial but not less than $20,000,000.00.

## COUNT IV

## NEGLIGENT MISREPRESENTATION

163.    Plaintiffs repeat and reallege as though fully set forth herein each of the allegations set forth in paragraphs 1 through 163.

164.    Defendants represented to Plaintiffs that they would perform the market valuation appraisals of the vessels based on their knowledge, experience, expertise, and research resources in the market in accordance with generally accepted standards, and that they would adequately investigate the vessels and the market before rendering their valuation of the vessels in accordance with generally accepted standards.

165.    In the performance of their market valuation appraisals of the vessels, Defendants had a duty to obtain and disclose true and accurate facts regarding the vessels and the market, to take reasonable steps to avoid disseminating false information to Plaintiffs, and to employ a reasonable degree of care in their performance of the valuations.

**PREG O'DONNELL & GILLETT PLLC**

901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

166.    In the May 2008 Appraisal, February 2009 Appraisal, and March 2011 Appraisal,   Defendants negligently made or caused to be made and represented to Plaintiffs that such appraisals contained true and accurate facts regarding the vessels and the market, and that they adequately investigated the vessels and the market in performing the market valuation appraisals.

167.    Defendants' misrepresentations as to their performance of the market valuation appraisals and their valuations of the vessels were material to Plaintiffs' decisions to purchase the vessels and/or invest in the shipping ventures for the agreed upon purchase prices.

168.    Defendants made the misrepresentations as to their performance of the market valuation appraisals and their valuations of the vessels, without using reasonable care in ascertaining the truth thereof, before making such representations to Plaintiffs.

169.    At the time Defendants made the misrepresentations, Defendants knew or should have known that they were not accurate and not in accordance with generally accepted standards.

170.    Plaintiffs reasonably believed Defendants' representations to be true, and relied upon such representations, to their detriment, in deciding to purchase the vessels and/or invest in the shipping ventures.

171.    Plaintiffs would not have purchased the vessels and/or invested in the shipping ventures, nor would they have paid the purchase prices paid, had the truth

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

regarding the Defendants' performance of the market valuation appraisals, and their valuations of the vessels, been disclosed.

172. Plaintiffs discovered the representations regarding the performance of the market valuation appraisals and the valuations of the vessels were negligent after Plaintiffs purchased the vessels and/or invested in the shipping ventures.

173. As a direct and proximate result of Plaintiffs' justifiable reliance on Defendants' negligent representations, Plaintiffs have been caused to incur significant costs, expenses and damages in excess of $20,000,000.00.

174. For the reasons described above, Defendants are liable to Plaintiffs in an amount to be proven at trial but not less than $20,000,000.00.

## COUNT V

## NEGLIGENCE

175. Plaintiffs repeat and reallege as though fully set forth herein each of the allegations set forth in paragraphs 1 through 175.

176. Pursuant to the terms of the parties' agreements, Defendants were obligated to perform the market valuation appraisals of the vessels based on their knowledge, experience, expertise, and research resources in the market in accordance with generally accepted standards, and to adequately investigate the vessels and the market before rendering their valuation of the vessels in accordance with generally accepted standards.

COMPLAINT - 28
10644-0002  5297549.doc
Cause No.

**PREG O'DONNELL & GILLETT** PLLC

901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

177.    Pursuant to Defendants' obligations under the parties' agreements, Defendants owed Plaintiffs a duty to perform such obligations with reasonable care to avoid damage to Plaintiffs.

178.    Defendants failed to perform their obligations under the terms of the agreements, by failing to exercise reasonable care in the performance of their market valuation appraisals of the vessels.

179.    Plaintiffs reasonably relied on Defendants' valuations of the vessels to their detriment in deciding to purchase the vessels and/or invest in the shipping ventures for the purchase prices paid.

180.    Plaintiffs would not have purchased the vessels and/or invested in the shipping ventures, nor would they have paid the purchase prices paid, had Defendants performed their market valuation appraisals of the vessels with reasonable care.

181.    Plaintiffs discovered that Defendants' negligently performed their market valuation appraisals of the vessels after Plaintiffs purchased the vessels and/or invested in the shipping ventures.

182.    As a direct and proximate result of Defendants' negligence, Plaintiffs have been caused to incur significant costs, expenses and damages in excess of $20,000,000.00.

183.    For the reasons described above, Defendants are liable to Plaintiffs in an amount to be proven at trial but not less than $20,000,000.00.

**PREG O'DONNELL & GILLETT PLLC**

901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

## <u>REQUEST FOR RELIEF</u>

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants as follows:

A.      Awarding Plaintiffs an amount to be proven at trial but not less than $10,000,000.00 on Count I;

B.      Awarding Plaintiffs an amount to be proven at trial but not less than $10,000,000.00 on Count II;

C.      Awarding Plaintiffs an amount to be proven at trial but not less than $20,000,000.00 on Count III;

D.      Awarding Plaintiffs an amount to be proven at trial but not less than $20,000,000.00 on Count IV;

E.      Awarding Plaintiffs an amount to be proven at trial but not less than $20,000,000.00 on Count V;

F.      Awarding Plaintiffs their attorneys' fees;

G.      Awarding Plaintiffs their costs and disbursements; and

H.      Awarding Plaintiffs such other and further relief as the Court shall deem just and proper.

///
///
///
///
///

**PREG O'DONNELL & GILLETT** PLLC

901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113

DATED this 30th day of November, 2015.

PREG O'DONNELL & GILLETT PLLC

By  /s/ Rodney Q. Fonda
     Rodney Q. Fonda, WSBA #6594
Attorneys for Plaintiffs T. F. Warren Group,
Inc., Vanguard Shipping (Great Lakes) Ltd.,
Vanship Ltd., Remstoan Investments, Inc.,
8219222 Canada Inc. o/a Phoenix Star
Shipping and Phoenix Sun Shipping, Inc.,
901 Fifth Avenue, Suite 3400
Seattle, Washington 98164
Firm Email:
     rfonda@pregodonnell.com

COMPLAINT - 31
10644-0002  5297549.doc
Cause No.

**PREG O'DONNELL & GILLETT** PLLC
901 FIFTH AVE., SUITE 3400
SEATTLE, WASHINGTON  98164-2026
TELEPHONE: (206) 287-1775 • FACSIMILE: (206) 287-9113